**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| Patricia Rowe P.A and | ) |
| Dr. Patricia S. Rowe | ) |
| individually and on behalf of other persons | ) |
| and entities similarly situated, | ) |
| | ) |
| Plaintiffs, | ) CIVIL ACTION NUMBER: |
| | )       JURY TRIAL |
| v. | ) |
| | ) |
| AT&T INC. AT&T CORP. | ) |
| BELLSOUTH TELECOMMUNICATIONS, LLC | ) |
| formerly | ) |
| BELLSOUTH TELECOMMUNICATIONS, Inc. | ) |
| and ABC COMPANY | ) |
| | ) |
| Defendants, | ) |
| _____ | ) |

Now come Plaintiffs and those similarly situated and for their Complaint against the

Defendants state:

**PARTIES**

1.    Plaintiff Patricia Rowe P.A. is or was a professional association owned and operated by

Plaintiff Dr. Patricia S. Rowe.

2.    Defendant AT&T Inc. ("AT&T") is a holding company incorporated under the laws of

the State of Delaware in 1983. Through its subsidiaries and affiliates, AT&T provides

wireline and wireless telecommunications services and equipment, directory advertising,

and other products and services. AT&T's principal executive offices are located at 208 S.

Akard St., Dallas, Texas 75202. AT&T maintains an Internet site at the following

location: http://www.att.com. AT&T receives the revenue from services provided by

Defendants AT&T CORP. and  BellSouth Telecommunications, Inc. and other AT&T

subsidiaries.

3.     AT&T owns AT&T CORP., a New York Corporation, which has as its registered agent in South Carolina as C T Corporation System located at 2 Office Park Court Suite 103 Columbia, SC 29223; which is the successor in merger to eleven telecommunication companies, which on information and belief, includes Defendant Bellsouth Telecommunications, LLC, formerly Bellsouth Telecommunications, Inc. [collectively "Bellsouth"].

4.      Bellsouth Telecommunications, LLC is, a Georgia Corporation, and has as its registered agent in South Carolina as C T Corporation System located at 2 Office Park Court Suite 103 Columbia, SC 29223.  Bellsouth changed its name from Bellsouth Telecommunications, Inc. on or about July 28th, 2011 to Bellsouth Telecommunications, LLC. Bellsouth is owned and/or operated by Defendant AT&T Inc. and/or AT&T CORP. [collectively hereinafter "AT&T"].

5.     ABC Company is a fictitious corporation which is named in the event that the proper Defendant or Defendants are not made parties in this case. Plaintiffs reserve the right to substitute the proper party Defendant(s) by amendment.

## BACKGROUND

6.     Defendants offer to consumers telecommunications and distribute standardized Service Agreements that are not subject to modification or negotiation; or if the consumer is shopping on the Internet, through read-only screens that cannot be modified by users. Defendants present these Agreements to prospective subscribers on a "take it or leave it" basis. These Agreements are contracts of adhesion.

7.     Each of Defendants' Service Agreements includes for the issues in this case, as a term

and condition of service, a purported liquidated damages clause that requires subscribers to pay early termination fees [sometimes referred to herein as "ETF" or "ETFs"] if for any reason the customer seeks to terminate service before the expiration of the contract period or thereafter when the agreement is renewed.

8.     The ETFs do not vary during the term of the contract. The customer is required to pay the full ETF whether he or she cancels fifteen calendar days into the contract or one day before the date it is scheduled to expire.

9.     The customer must pay the ETF when the contract is automatically renewed.

10.    The ETF is a penalty, and in fact is not a reasonable measure of the anticipated or actual loss, if any, that the termination causes Defendants.

11.    Apparently, the actual purpose of the ETF is to discourage a customer from changing communication carriers.

12.    Defendants therefore disguise an early termination fee which is an illegal penalty. The ETF is not actually designed to compensate Defendants for any damages arising from the termination, but has the effect and purpose of locking in subscribers and discouraging them from switching to competing services (what is known as "churn").

13.    Defendants' early termination fee discourages competition because it prevents consumers from freely shopping for the best telephone or mobile service.

14.    The ETF is not a rate charged, nor is it part of Defendants' rate structure, nor is it a rate component charged for any "service." While it may be part of the "Terms and Conditions", it can only be categorized as an illegal penalty.

15.    Plaintiffs seek monetary relief for Bellsouth's and AT&T's systematic and repeated collection of termination fees based on the Bellsouth's and AT&T's [collectively

"Defendants"] claims that its standard business services agreement ("Services Agreement") was validly renewed by an automatic renewal clause; and for Bellsouth's and AT&T's fraudulent and deceptive conduct relating to the early termination fees it collects through the purported automatic renewal of its Service Agreements.

16.    Defendants unilaterally and automatically renews its service agreements so that Defendants have elongated its standard Service Agreements. Defendants have deceived and defrauded its customers through responses to telephone inquires, mailing of statements and electronic transmissions, and by conveying the false impression that customers are obligated for months of service; and if cancelled, will be charged an ETF. Defendants have also been unjustly enriched by charging ETFs under automatic renewals of its Service Agreements to take advantage of its customers.

## NAMED PLAINTIFF'S FACTS

17.    Plaintiff Patricia S. Rowe is a chiropractic doctor and does business as Patricia Rowe P.A, a professional association.

18.    Plaintiff Dr. Patricia S. Rowe prior to November 8, 2007 was solicited by the Defendants to utilize their telecommunication services.

19.    Based upon the representations of the Defendants,  Plaintiffs agreed to utilize the Defendants' telecommunication services for a period of 12 months. For this purpose, the Plaintiffs signed the attached service agreement marked Exhibit A on November 8, 2007 for 12 months ending on or about December 8, 2008.

20.    Plaintiffs continued service and paid for the telecommunication services with the Defendants far exceeding the original term of 12 months.

21.    In or about May 2012, the Plaintiffs decided to discontinue telecommunication services with the Defendants.

22.    When Plaintiff contacted Defendants, via phone, to discontinue telecommunication, a representative (Kate or Karen) of Defendants informed the Plaintiff that she would owe a termination fee.

23.    The representative (Kate or Karen) of Defendants further informed the Plaintiff that notice of an automatic renewal for 36 months was included in her May 5, 2010 invoice.

24.    Hidden in the over 30 pages of attached bills marked Exhibit B, on the second page of the May 5, 2010 three-page invoice; and under the sixth heading titled "**News You Can Use**", in the third of six paragraphs under that heading, in small print it was stated:

AUTOMATIC RENEWAL
Continued Savings! Although your local service agreement is scheduled to expire in approximately 180 days, it is also scheduled to automatically renew. There's nothing you need to do. Simply enjoy the ongoing savings every month, based on the terms and conditions of your existing agreement. If you wish not to renew your agreement, please call 1.866.843.1258 for direction about the notification of your intent not to renew that you must provide in writing at least 60 days prior to expiration date.

25.    The Defendants Automatic Renewal misstated to the Plaintiff:

a.    That they would have Continued Savings
b.    That the service agreement had not expired, when it had
c.    That the service agreement had a provision to automatically renew
d.    That the Plaintiff had nothing that she "need[ed] to do" when in fact to avoid the renewal ETFs customers had to call 1.866.843.1258 for direction on how not to renew and had to provide in writing notice at least 60 days prior to the expiration date.

26.    The Defendants' Automatic Renewal made it extremely difficult to avoid the renewal.

27.    Nowhere within the written service agreement marked Exhibit A is there mentioned any provision for the automatic renewal of the service agreement with the Defendants.[1]

---

[1]In addition to the written terms, the Contract states that the subscriber can review BellSouth's terms "incorporated by reference" on its website or request a copy by calling a toll free number.

28.     The language of the automatic renewal notice was intentionally inconspicuous and cumbersome by requiring customers to call to find out how to give "notification of your intent not to renew."

29.     Defendants included this automatic renewal term in the invoice notwithstanding the requirement in the written Service Agreement that the contract "not be altered, modified, amended or superseded in any respect other than by written instrument executed by … both parties."

30.     Representative of the Defendants, informed Plaintiffs that if they were to terminate the contract with the Defendants there would be an early termination fee for a 36 months promotion plan service in the amount of $600.

31.     On the May 5th, 2012 AT&T  mailed a bill to the Plaintiff in which the Plaintiff was charged under the title "Promotions and Discounts" $600 for the "Simple Savings Promotion 36 Month Term agreement terminated May 4."

32.     On May 29th, 2012, AT&T  mailed to the Plaintiff an invoice claiming that "$649.72 is past due and payment has not yet been received".

33.     On June 5th, 2012,  AT&T mailed to the Plaintiff  another bill for $652.31 which included the $600 termination charge with interest.

34.     Under duress that her credit rating would be compromised, and because of the fraudulent representation that the service agreement had been legally renewed, Plaintiff paid $652.31 with a letter protesting the early termination charge.

---

Plaintiff maintains that if there were automatic renewal provisions with penalties for ETFs, that Defendants who drafted the contract purposefully hid these provisions; and a reasonable person contracting with Defendants should not be held to have agreed to terms not written in the document provided by Defendants.

35.  The Defendants have charged and collected, and are continuing to charge and collect, ETFs based upon an automatic renewals which the Defendants claim is authorized by their service agreements.

## JURISDICTION

36.  Personal jurisdiction over Defendants exists because Defendants regularly and continuously conducted business in interstate commerce that is carried out in part in the State of South Carolina, committed illegal acts in, and maintain agents or representatives in, or are found in this District. Subject matter jurisdiction and venue exists, in whole and/or in part, upon 47 U.S.C. § 207 (common carrier); 28 U.S.C. § 1331 (federal question) under section 1964 (a), (b), (c), section 1965 (a), (b), (d) of the Racketeer Influenced and Corrupt Organizations Act of 1970 (hereinafter, "RICO"); and pursuant to 28 United States Code 1332 (diversity, as amended by the Class Action Fairness Act of 2005) because the amount in controversy exceeds five million dollars. Pursuant to 28 United States Code §1391(b), venue is appropriate since a substantial part of the events or omissions giving rise to the claim occurred in Greenville South Carolina.

## CLASS ALLEGATIONS

37.  Plaintiff Dr. Rowe brings this action on behalf of herself, and all other persons and entities designated herein as "The Class" defined as:

> All persons and entities within the United States that have phone, telecommunication, and/or internet service with Defendants for which the original contract was automatically renewed by Defendants and Defendants charged or collected an early termination fee from that person or entity.  Excluded from the Class are officers, directors, and employees of Defendants.

38.    The plaintiff also brings this action for a subclass designated as the "State Sub-class" of

plaintiffs defined as follows:

All members of the Class who contracted for service using the

standard contract marked Exhibit A[2] with Defendants within the States

of Georgia, North Carolina, and South Carolina, and whose claim

arose within applicable statutes of limitations.

39.    On information and belief, the number of persons and entities in the Class and Subclass is so

numerous that joinder of all members it is impracticable to bring all such persons before this

Court. Attached as Exhibit C is an excel spreadsheet list of 419 complaints against the

Defendants provided by the Consumer Affairs Department of the State of South Carolina. As

shown by Exhibit C, the Consumer Affairs Department of the State of South Carolina has

received complaints concerning Defendants charging early termination fees from at least seven

South Carolina residents; and has had innumerable complaints about the Defendants billing

---

[2]The contract marked Exhibit A  included:
FOR SOUTH CAROLINA CUSTOMER, THIS AGREEMENT IS SUBJECT TO
ARBITRATION IN ACCORDANCE WITH THE SOUTH CAROLINA UNIFORM
ARBITRATION ACT, SECTION 15-48-10 .
This clause is inapplicable because the contract was fully performed. Defendants have
inserted clauses similar to the Plaintiff's above that purport to impose mandatory
arbitration and/or waive the right to class action. However, these terms and conditions
constitute contracts of adhesion insofar as they are drafted entirely by the Defendants on a
take-it-or-leave-it basis. Plaintiffs had neither the bargaining power nor the ability to change
the contractual terms. Defendants rely on its purported mandatory arbitration provisions to
shield it from civil liability. In practice, the waivers virtually immunizes the Defendants from
responsibility for their own wrongful conduct. Such waivers are unconscionable and
should not be enforced. Further, on information and belief, Defendants do not use
arbitration to resolve their own claims against a customer. Instead, Defendants resolve
scores of claims against customers by assigning them to their collection department or to
collection agencies who then pursue a variety of means to collect, including filing lawsuits
and filing adverse credit reports with credit bureaus; but not arbitration.

practices. Further, attached as Exhibit D is a letter from the Consumer Affairs Department of Georgia stating it has 888 files concerning complaints against the Defendants.

40.    All members of the Class were affected by the same event which present questions of law and fact which are common to each member of the class, and which are common to the entire class as a whole.

41.    Dr. Rowe's claims are typical of the claims and damages of Class and Subclass members.

42.    There are questions of law or fact common to the Class, including at least the following:

    (a)    Whether the ETF is an unreasonable penalty such that a reasonable person would not be bound thereby;

    (b)    Whether Defendants' conduct violated the Federal Communications Act;

    (c)    Whether Defendants charged Class members ETFs;

    (d)    Whether the ETF is an unlawful penalty or is unjust;

    (e)    Whether Defendants' conduct constitutes deceptive, unfair and/or oppressive conduct;

    (f)    Whether Defendants are/were unjustly enriched;

    (g)    Whether the Defendants can unilaterally automatically renew the Plaintiffs and class members' telephone, telecommunication and/or internet service contracts;

    (h)    Whether the Defendants committed mail and wire fraud by mailing inconspicuous notices; and mailing bills, and using the telephone and internet for collecting early termination fees on contracts after their initial term;

    (i)    Whether declaratory relief is appropriate; and

    (j)    Whether Plaintiffs and the Class have been damaged, and if so, the

proper measure of such damages.

43.    The Representative Plaintiffs will fully and adequately protect and represent the Class as a whole.

44.    The identity of all members of each Class cannot be determined at this time, but will be so determined at a later time upon obtaining discovery from Defendants.

45.    The prosecution of separate actions by members of each class would create a substantial risk of inconsistent or varying adjudications with regard to individual members of the Class which would establish incompatible standards of conduct for the Defendant.

46.    Further, the prosecution of separate actions would also create a substantial risk of adjudication with respect to individual members of each class which, as a practical matter, would be dispositive of the interest of other members not party to the adjudication, thereby substantially impairing and impending their ability to protect these interests.

47.    Due to Defendants' actions and omissions, Plaintiff and members of the Class have paid ETFs and been damaged in the amounts of their early termination fees, which are not of a sufficient amount for each individual to bring a separate lawsuit.

48.    The maintenance of this suit as a class action is the superior means of disposing of the common questions which predominate here.

## COUNT ONE

## VIOLATION OF SECTION 201(b) OF THE FEDERAL COMMUNICATIONS ACT (FCA)

49.    Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

50.    Defendants are common carriers engaged in interstate or foreign communication by wire or radio, and subject to the common carrier regulation set forth at 47 U.S.C. § 201, *et.*

*seq.*

51. Defendants' early termination fees, described above, are charges and/or practices in connection with communication service, subject to the requirements of 47 U.S.C. § 201(b).

52. Section 201(b) of the Federal Communications Act (FCA), 47 U.S.C. § 201, mandates that all charges be "just and reasonable." 47 C.F.R. § 64.2401 implementing the FCA imposes Truth-in-Billing Requirements and requires that "charges contained on phone bills be accompanied by a brief, clear, non-misleading description of the service or services rendered." The Federal Communications Commission [FCC] has held that misleading or deceptive billing information is unjust and unreasonable; and therefore, violates Section 201(b). Specifically, "Charges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered. The description must be sufficiently clear in presentation and specific enough in content so that customers can accurately assess that the services for which they are billed correspond to those that they have requested and received, and that the costs assessed for those services conform to their understanding of the price charged...".

53. Defendants violated the aforestated Truth-in-Billing Requirements by hiding in verbiage the unilateral automatic renewal notice, and by failing to give a separate notice apart from the bill which include a brief, clear, non-misleading in plain language description that the service would be renewed with a provision for the customer to agree for services to be rendered to be renewed or continued for a certain term.

54. Defendants' assessment of the early termination charges was unjust and unreasonable and was not for services requested and received.

55.     By virtue of the violated the aforestated violations,  Plaintiff and the Class  are entitled to

recover from Defendants the paid ETFs plus interest as damages, attorneys' fees, and costs

pursuant to 47 U.S.C. § 206.

## COUNT TWO

### CONVERSION

56.     Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here

verbatim.

57.     By deceit, the Defendants have obtained ETFs from the Plaintiff and Class and converted

those funds to their use, thereby depriving the Plaintiff and Class of the use of their money.

58.     By virtue of the violated the aforestated,  Plaintiff and the Class are entitled to recover from

Defendants the paid ETFs plus interest as damages.

## COUNT THREE

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970 ("RICO")

59.     Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here

verbatim.

60.     This is cause of action is brought pursuant to the provisions of the Corrupt Organizations Act

of 1970 ("RICO"), Title 18 U.S.C. §§ 1961, *et. seq*.

61.     The following constitute a "enterprise," as that term is defined in 18 U.S.C. §1961(4); and

which was engaged in activities affecting federal interstate and/or foreign commerce:

During the 19th century, AT&T[3] became the parent company of the Bell System[4], the American telephone monopoly. The U.S. Department of Justice sued AT&T for illegally monopolizing the telephone industry. In 1984, through an agreement between the former AT&T and the U.S. Department of Justice, AT&T agreed to divest itself of its local telephone operations (but retained its long distance, R&D and manufacturing arms). From this arrangement, SBC Communications Inc. (formerly known as Southwestern Bell Corp.) was born. BellSouth also was formed in 1983 as part of the court-ordered breakup of the American Telephone and Telegraph Company (AT&T). In 2005, SBC Communications Inc. acquired AT&T Corp., creating the new AT&T. AT&T acquired BellSouth[5] in 2006.

62.    AT&T and Bellsouth and other Bell Companies described herein, in order to promote their unlawful objectives, constituting a cognizable "enterprise", conducted or participated in, directly or indirectly, the affairs of the AT&T and Bellsouth and other Bell Companies through a "pattern" of "racketeering", specifically mail and/or wire fraud as more particularly

---

[3]These facts are obtained from the prospectus filed with the Securities Exchange Commission at: http://www.sec.gov/Archives/edgar/data/732717/000119312513048195/d484862d424b5.htm#tx 450489_1

[4]AT&T was frequently accused of suppressing competition through unfair trade practices.

[5]Prior to 12/31/1991, BellSouth Corporation consisted of two separate operating companies: South Central Bell Telephone Company (SCTC) consisting of five study area jurisdictions: Alabama (SCAL), Kentucky (SCKY), Louisiana (SCLA), Mississippi (SCMS) and Tennessee (SCTN), and Southern Bell Telephone and Telegraph Company (SBTC) consisting of four study area jurisdictions: Florida (SBFL), Georgia (SBGA), North Carolina (SBNC), and South Carolina (SBSC). On 1/1/1992, South Central Bell and Southern Bell were merged, forming BellSouth Telecommunications, Inc. (BSTR), a corporation that is wholly-owned by BellSouth Corporation.

described below; thereby caused pecuniary loss, and other economic injury to the Plaintiffs and members of the Class.

63.   AT&T and each of the Corporate Defendants, and their corporate predecessors in interest constitutes a "person," as that term is defined pursuant to Section 1961(3) of RICO, and each is or was engaged in activities affecting federal interstate and/or foreign commerce.

64.   The Defendants were affiliated and associated with each other and engaged in conduct of the enterprise through a pattern of racketeering activity (specifically mail and wire fraud) within the meaning of 18 U.S.C. § 1962 and of 18 U.S.C. §1961 (1) by engaging in the acts set forth herein including but not limited to intentionally fraudulently charging the Class' members for early termination fees, and aiding and abetting the fraudulent acts.

65.   The Plaintiffs and the Class members were the victims of criminal activity conducted upon the Class, either directly or indirectly by the Defendants or their legal predecessors in interest.

66.   Additionally, in the acts set forth herein including but not limited to intentionally fraudulently charging Class members for early termination fees, the corporate Defendants aided and abetted in the commission of the following acts, and/or conspired to commit the following acts, in violation of the following laws and thereby victimized the individual Plaintiffs and class members by misappropriating moneys of the Class and their members.

67.   The  Defendants used the mails each year from at least 2010 to present to send out invoices that intentionally hid in verbiage automatic renewal of contracts, and further used the mails each year to bill and collect large amounts in ETFs, all in furtherance of an ongoing scheme or artifice to defraud customers.

68.   By way of example only, and consistently with the practices in previous and subsequent years, the Defendants AT&T and Bellsouth (directly or through one of its subsidiaries that it totally

dominated) in 2007 used the telephone, wires and/or mail to forward to Plaintiff the contract

attached as Exhibit A in violation of 18 U.S.C. § 1341 and 1343 which was deliberately,

substantially, and materially misleading, in that:

a.      It omitted the true cost of telephone and internet service by omitting the cost of

        termination after unilateral automatic renewal of the contract.

b.      Said Defendants failed to disclose that they intended to collect early termination fees

        after the 12 month initial term.

c.      Said Defendants misrepresented that telephone and internet service termination fees

        would not apply if termination occurred after the first 12 months; when Defendants

        intended to collect ETFs thereafter.

69.     By way of further example only, and consistently with its practices in previous and

subsequent years, the Defendants mailed an Automatic Renewal notice on May 5th, 2010

which was purposely inconspicuous and misleading. The language of the automatic renewal

was not only inconspicuous but required customers to call a toll free number to obtain

instructions about the "notification of your intent not to renew that you must provide, in

writing, at least 60 days prior to expiration date". Defendants included this automatic renewal

term in one of many invoices, notwithstanding the requirement in the Exhibit A service

agreement that the Contract "not be altered, modified, amended or superseded in any respect

other than by written instrument executed by … both parties."

70.     On or about May 3rd, 2012, representative of the Defendants (Kate or Karen), used the phone

to misinform Plaintiff (and on belief with other members of the Class on other dates) that if

they were to terminate service with the Defendants there would be an early termination fee.

Additionally, this was false and constituted wire fraud to collect an amount not owed using the phone in violation of 18 U.S.C. § 1343.

71.    In the May 5th, 2012 AT&T bill, the Plaintiff was charged under the title " Promotions and Discounts" $600 for the " Simple Savings Promotion 36 Month Term agreement terminated May 4." This was false and misleading because the Plaintiffs' service agreement with the Defendants was for 12 month and not for a 36 Month Term. Additionally, this was false and constituted mail fraud to collect an amount not owed using the mails in violation of 18 U.S.C. § 1341.

72.    On May 29th, 2012 AT&T sent a letter claiming that "$649.72 is past due and payment has not yet been received". This was false and constituted mail fraud to collect an amount not owed using the mails in violation of 18 U.S.C. § 1341.

73.    On June 5th, 2012 AT&T mailed another bill for $652.31 which included the $600 termination charge with interest. This was false and constituted mail fraud to collect an amount not owed.

74.    Because of the fraudulent representations that the service agreement had been renewed, Plaintiff and Class incurred and/or paid the early termination charges with interest.

75.    As a direct and proximate result of the foregoing, the Plaintiff suffered damages in the amount of $600, plus interest; and the Class sustained losses in an amount to be proven at trial including ETfs paid and accrued interest.

76.    As shown by Exhibit E, the Consumer Affairs Department of the State of Georgia is undergoing a current investigation concerning Defendants' practices, which are believed also unlawful under the consumer laws of Georgia.

77.    Upon information and belief, and on average, each member of the Class has been damaged in the amount of their early termination fees, plus interest. As a direct and proximate result of the foregoing, the class members were charged and paid fees inflated in the aggregate by thousands or millions of dollars.

78.    Plaintiff and the Class are entitled to recover from Defendants treble damages (three times the ETFs plus interest), attorneys' fees, and costs pursuant to 18 U.S.C. § 1964.

**COUNT FOUR**

**UNJUST ENRICHMENT**

79.    Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

80.    Plaintiffs assert this Count for herself and on behalf of the members of the Class.

81.    Defendants have made numerous representations that Plaintiff and Class owe termination fees for early terminations of automatically renewed service agreements.

82.    By way of its automatic renewal, Defendants have demanded that Plaintiff and members of the Class pay early termination fees.

83.    Plaintiff and Class members, in turn, paid ETFs which exceeded the applicable and approved service fees.

84.    The Plaintiff and Class conferred a benefit on the Defendants.

85.    The Defendants accepted the benefit of ETFs which exceeded the fees approved by the FCC that were applicable to all service users.

86.    The Defendant accepted ETFs and retained the benefits of ETFs under inequitable and/or unjust circumstances.

87.     It would be unjust for AT&T to retain any early termination fee payment by Plaintiff and members of the Class in excess of the actual phone and internet usage at prevailing rates.

88.     Accordingly, Defendants are liable to Plaintiff and members of the Class for services for which they are billed correspond to those that they have requested and received exceeded the prevailing fees approved by the FCC for service actually received.

### COUNT FIVE

### MONEY HAD AND RECEIVED

89.     Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

90.     The Defendants received money belonging to the Plaintiffs and Class. Defendants benefitted from the receipt of said money. It would be inequitable and unconscionable for the Defendants to retain said money and not return said money to the Plaintiffs and Class.

91.     As a direct and proximate cause of this conduct by the Defendants, the Plaintiffs and Class have suffered losses of the ETFs plus interest.

### COUNT SIX

### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201

92.     Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

93.     There is an actual controversy between Defendants and the Class concerning the enforceability of the early termination fee provisions contained in the customer service agreements to which they are parties.

94.     Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal

relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

95.    Plaintiffs are interested parties who seek a declaration of their rights and legal relations vis-à-vis Defendants with regard to early termination fee provisions. Specifically, Plaintiffs seek a declaration that such provisions are unlawful and unenforceable.

## COUNT SEVEN

### INJUNCTION

96.    Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

97.     Defendants' illegal practices of charging ETFs and sending unreasonable notices of unilateral automatic renewals are continuing.

98.    The Class will suffer irreparable harm, including but not limited to injury to their credit ratings, unless the Court enjoins these unlawful practices.

99.    The remedies at law in damages are inadequate because those damages will only be available after this case is tried and will not stop the collateral effect of preventing members of the Class the free choice of phone providers without incurring the threat of an ETF penalty.

100.    The Plaintiff has demonstrated above the likelihood of success on the merits.

101.    Therefore, this court should enjoin Defendants from unilaterally renewing service contracts and from collecting early termination fees on renewed contracts.

## COUNT EIGHT

### PUNITIVE DAMAGES

102.    Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

103.    The plaintiff brings this Count for the Class of Plaintiffs defined above.

104.    Defendants sent invoices to the Plaintiffs and Class that showing they owed ETFs and that their service contracts were validly renewed.

105.    These invoices were false.

106.    Defendants knew or should have known of the falsity of these invoices and intended Plaintiffs and the Class to act on these false invoices by paying the ETFs or continuing services.

107.    Defendants have unlawfully obtained and converted funds.

108.    Defendants should be deterred from unlawfully obtaining and converting funds, sending false representations and invoices, and  unlawfully collecting ETFs.

109.    Plaintiffs and the Class should be awarded punitive damages in such amounts as to deter Defendants in the future from unlawfully obtaining and converting funds, sending false representations and invoices, and  unlawfully collecting ETFs.

## COUNT NINE

## NEGLIGENT MISREPRESENTATION

110.    Allegations of the preceding paragraphs are incorporated by reference as if fully set forth here verbatim.

111.    The plaintiff brings this Count for the SubClass of Plaintiffs defined above.

112.    The Restatement (Second) of Torts § 552 followed in the states of South Carolina, Georgia, and North Carolina as a cause of action provides:

> One who, in the course of his business, profession or employment, or
>
> in any other transaction in which he has a pecuniary interest, supplies
>
> false information for the guidance of others in their business
>
> transactions, is subject to liability for pecuniary loss caused to them by

their justifiable reliance upon the information, if he fails to exercise

reasonable care or competence in obtaining or communicating the

information.

113.     Defendants had a pecuniary interest in obtaining automatic renewals and ETFs.

114.     Defendants negligently or intentionally supplied false information for the guidance of

Plaintiffs and the Class in their business.

115.     Defendants failed to act reasonably and thereby proximately caused the Plaintiffs and the

Class pecuniary losses.

116.     Accordingly, Defendants are liable to Plaintiff and members of the Class for the ETF

payments plus interest.

## COUNT TEN

## UNFAIR BUSINESS PRACTICES

117.     Allegations of the preceding paragraphs are incorporated by reference as if fully set

forth here verbatim.

118.     The Plaintiff brings this Count individually.

119.     South Carolina Code § 39-5-20 makes unfair or deceptive acts or practices unlawful.

120.     Defendants' acts or practices alleged herein above were unfair or deceptive.

121.     Defendants' unfair or deceptive acts or practices were made in the conduct of a trade

or commerce and affected trade or commerce.

122.     Defendants' unfair or deceptive acts or practices affect the public interest.

123.     Defendants' unfair or deceptive acts or practices are continuing and are capable of

repetition.

124.    Pursuant to South Carolina Code § 39-5-140, Plaintiff is entitled to recover from Defendants her loss of money as a result of the use or employment by Defendants of afore-alleged  unfair or deceptive methods, acts or practices.

125.    Defendants' use or employment of the unfair or deceptive methods, acts or practices was a willful or knowing violation of § 39-5-20. The court therefore should award three times the actual damages sustained and provide such other relief as it deems necessary or proper, including reasonable attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

126.    Plaintiff demands trial by jury on all claims to which a trial by jury may be had.

**WHEREFORE**, Plaintiffs individually and on behalf of the Class and Subclass of persons described herein, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Classes defined herein;

B.    Designating Plaintiffs as representatives of the Class and Subclass and counsel as Class counsel;

C.    Entering judgment in favor of Plaintiffs and the Class and against Defendants for the ETFs including interest thereon;

D.    Awarding Plaintiffs and Class members treble damages;

E.    Awarding Plaintiffs and Class members punitive damages;

F.    Enjoining Defendants from unilaterally renewing service contracts and from collecting early termination fees on contracts that have been renewed;

G.  Declaring that the ETFs and unilaterally renewing service provisions are unlawful and unenforceable;

H.  Declaring that the arbitration provisions are inapplicable and/or unenforceable;

I.  Awarding attorneys' fees and costs; and

J.  Granting such further relief as the Court deems just and equitable.


April ____, 2013

s/Stanley G. Jackson
Stanley G. Jackson (#9077)
321 Newberry Street SW
Aiken, South Carolina
(803) 643-1003
Attorney for the Plaintiffs

## VERIFICATION

PERSONALLY APPEARED before the undersigned attesting officer duly authorized to administer oaths, Dr. Patricia S. Rowe, who under oath deposes and says that to the best of his information, knowledge and belief, the facts contained in the foregoing Complaint are true and correct.

This _____ day of _____, 2013

_____
Dr. Patricia S. Rowe

Sworn to and Subscribed before me
this _____ day of _____, 2013


_____
NOTARY PUBLIC