UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Patricia Rowe P.A. and Dr. Patricia S. Rowe, *individually and on behalf of other persons and entities similarly situated*, | ) ) ) ) ) | C/A No.: 6:13-cv-01206-GRA |
| Plaintiff, | ) ) | **ORDER** (Written Opinion) |
| vs. | ) ) ) | |
| AT&T, Inc.; AT&T Corp.; BellSouth Telecommunications, LLC *formerly BellSouth Telecommunications, Inc.*; and Evergreen Telecom Services, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This litigation arises out of Plaintiff Dr. Patricia Rowe's purchase of telecommunication services from Defendants AT&T Inc., AT&T Corp., and BellSouth Telecommunications, LLC ("BellSouth") (collectively "AT&T") for her business. Plaintiff contends that as a result of an automatic renewal provisions contained in her original services contract, AT&T charged her, and many other similarly situated customers, an early termination fee. Arguing that AT&T has been fraudulent and deceptive, Plaintiff looks to this Court to remedy AT&T's widespread practice of unauthorized contract renewals and early termination fees ("ETFs").

Defendants have not responded to the merits of Plaintiff's putative class-action complaint. Instead, AT&T argues that Plaintiff cannot seek relief in this Court because the "BellSouth Service Agreement for Business Services Bundled Offerings in South Carolina" (the "BSA") requires Plaintiff to submit all of her claims to binding arbitration. Plaintiff disagrees, asserting that she, and other customers like her, never

agreed to arbitrate or waive the right to participate in a class action regarding an early termination fee.  Plaintiff further contends that the BSA is unconscionable.

This matter is formally before this Court based on two motions.  The first is Defendant AT&T Inc.'s amended and re-urged motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  The second is Defendants AT&T Inc., AT&T Corp., and BellSouth's amended and re-urged motion to compel arbitration of all claims asserted by Plaintiff in her amended & restated complaint. After reviewing the parties' submissions and the statements of counsel at the hearing on these motions, this Court DENIES Defendant AT&T Inc.'s motion to dismiss and GRANTS Defendants' motion to compel arbitration and stay proceedings.

## Background

On November 8, 2007, Plaintiff contracted with AT&T to receive telecommunications services at her chiropractic business for a twelve-month period and signed the "BellSouth Welcoming Rewards Promotion Agreement" (the "WRPA"). ECF No. 24-1.  The WRPA specifies that it includes "terms incorporated by reference," including terms listed on BellSouth's website. *Id.* at 2.  Plaintiff signed the contract under an acknowledgment stating: "[b]y signing or indicating acceptance, I acknowledge and accept all terms of the Agreement as set forth above, including all terms set forth in the 'Service Agreement, Service Descriptions and Price Lists' found at http://cpr.bellsouth.com/bst/product_line.htm."  *Id.* at 4.  Several months prior to Plaintiff signing her contract, a copy of the BSA applicable to her was posted on AT&T's (then BellSouth's) website at http://cpr.bellsouth.com/bst/product_line.htm (the web address mentioned in the acknowledgment).  *See* ECF No. 14-2.  In

addition, AT&T contracted with a third-party vendor to mail new customers an information package that included, among other things, the BSA. *See* ECF Nos. 14-1 & 14-3.  The BSA contained the following pertinent provisions:

> **BY APPLYING FOR, SUBSCRIBING TO, USING, OR PAYING FOR THE ORDERED SERVICE, YOU AGREE TO BE BOUND BY THE CHARGES, TERMS, AND CONDITIONS SET FORTH IN THIS AGREEMENT.  IF YOU DO NOT AGREE WITH THE PROVISIONS OF THIS AGREEMENT, DO NOT USE THE SERVICES AND CANCEL THIS AGREEMENT IMMEDIATELY BY CONTACTING BellSouth AT 1-800-753-8172.**
>
> . . .
>
> **THIS AGREEMENT REQUIRES THE USE OF ARBITRATION TO RESOLVE CERTAIN DISPUTES AND OTHERWISE LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE. PLEASE READ SECTIONS 6 AND 8.**
>
> . . .
>
> **8. DISPUTE RESOLUTION INDEPENDENT ARBITRATION**
> PLEASE READ THIS SECTION 8 CAREFULLY. THIS SECTION 8 SETS FORTH THE PROCEDURE FOR THE RESOLUTION OF DISPUTES UNDER THIS AGREEMENT THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BEFORE A JUDGE OR JURY OR THROUGH CLASS ACTION. . . . EXCEPT AS PROVIDED IN THIS SECTION 8, ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED IN CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION OR ANY OTHER LEGAL OR EQUITABLE THEORY), INCLUDING ANY DISPUTE BASED ON ANY SERVICE OR ADVERTISING OF THE SERVICE RELATED TO THIS AGREEMENT, SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION, WHICH SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), 9 U.S.C. §§ 1-16.
> . . .
> DISPUTES UNDER THIS AGREEMENT MAY NOT BE (A) RESOLVED ON A CLASS-WIDE BASIS, (B) JOINED WITH ANOTHER LAWSUIT, OR (C) JOINED IN ANY ARBITRATION OF A DISPUTE OF ANY OTHER PERSON.
> . . .

ECF No. 24-5 (emphasis in original).

Plaintiff continued service and paid for such services with AT&T far exceeding the original 12-month term included in the signed WRPA and exceeding the 36-month term on a BellSouth Long Distance, Inc. Auto Renew Term Plan Agreement, which Plaintiff utilized.  ECF No. 24 at 6.  In May 2012, Plaintiff decided to discontinue her business telecommunications services with AT&T and contacted AT&T by telephone to discontinue her services.  *Id.*  It was at this time that Plaintiff was informed she would owe an early termination fee.  *Id.*  The AT&T representative informed Plaintiff that notice of an automatic renewal for 36 months had been included in her May 5, 2010 invoice.  *Id.*  The May 5, 2010 three-page monthly billing statement included a heading titled "NEWS YOU CAN USE" and contained the following provision:

> AUTOMATIC RENEWAL
> Continued Savings! Although your local service agreement is scheduled to expire in approximately 180 days, it is also scheduled to automatically renew.  There's nothing you need to do.  Simply enjoy the ongoing savings every month, based on the terms and conditions of your existing agreement. If you wish not to renew your agreement, please call 1.866.843.1258 for direction about the notification of your intent not to renew that you must provide, in writing, at least 60 days prior to expiration date.

ECF No. 24-8 at 3.  The AT&T representative further informed Plaintiff that termination of her services would result in a $600 early termination fee, which was then added to Plaintiff's May 5, 2012 AT&T invoice.  ECF Nos. 24 at 8, 24-9 at 10. On May 29, 2012, AT&T mailed Plaintiff an invoice detailing the following:

> We recently sent you a final bill for your former telephone service. Our records indicate that $649.72 is past due and payment has not yet been received.
>
> Please send us your payment today or call so that we can make arrangements for payment which are convenient for you.
>
> If your payment is already on the way, please accept our thanks.

If you have any questions, please call 1-877-977-2187.

Account Representative
AT&T Accounts Receivable Center, AT&T South Carolina

ECF No. 24-9 at 11.  This invoice also included instructions on "HOW TO PAY YOUR BILL."  *Id.*  Plaintiff's final bill was revised and dated June 5, 2012 indicating her outstanding balance to be $652.31.  *Id.* at 13.  Plaintiff paid the bill "[u]nder duress that her credit rating would be compromised . . . with a letter protesting the early termination charge."  ECF No. 24 at 9.

On May 3, 2013, Plaintiff instituted this action against Defendants AT&T Inc., AT&T Corp., BellSouth, and ABC Company.  ECF No. 1.  On September 24, 2013, Defendant AT&T Inc. filed a motion to dismiss for lack of jurisdiction, ECF No. 13, and Defendants AT&T Inc., AT&T Corp., and BellSouth, filed a motion to compel arbitration and stay litigation, ECF No. 14.  On October 19, 2013, Plaintiff filed responses in opposition to both motions, ECF Nos. 21–22, and also filed an amended and restated complaint, adding Defendant Evergreen Telecom Services, LLC and asserting additional causes of action, ECF No. 24.  In the amended and restated complaint, Plaintiff makes the following claims and requests for relief against Defendants: (1) violations of Section 201(b) of the Federal Communications Act ("FCA"), 47 U.S.C. § 201(b); (2) conversion; (3) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961; (4) unjust enrichment; (5) money had and received; (6) declaratory relief pursuant to 28 U.S.C. § 2201; (7) injunction; (8) punitive damages; (9) negligent misrepresentation; (10) unfair business practices; (11) unfair trade practices; and (12) civil conspiracy.  ECF No. 24.  Plaintiff

claims that AT&T improperly charged her, and other customers like her, an early termination fee for cancelling a contract that had been unilaterally renewed. *Id.*

On November 4, 2013, Defendant AT&T Inc. replied to Plaintiff's response in opposition of its motion to dismiss, ECF No. 31, and Defendants replied to Plaintiff's response in opposition of their motion to compel arbitration, ECF No. 32. On November 11, 2013, Defendant AT&T Inc. filed an amended and re-urged motion to dismiss under Rule 12(b)(2) for lack of jurisdiction, ECF No. 33, and Defendants AT&T Inc., AT&T Corp., and BellSouth filed an amended and re-urged motion to compel arbitration and stay litigation, ECF No. 34, indicating that the prior briefings filed by the parties relating to the pending motions apply to Plaintiff's amended and restated complaint. On November 12, 2013, Plaintiff filed a sur-reply to Defendants' motion to compel. ECF No. 36. On November 20, 2013, Plaintiff filed responses to the amended and re-urged motions, incorporating her previous filings with this Court and asking this Court to deny the requested relief. ECF Nos. 38–39. On December 3, 2013, this Court heard arguments on the pending motions[1]. ECF No. 40. After the hearing, on December 11, 2013, Defendants AT&T Inc., AT&T Corp., and BellSouth sent a letter to this Court addressing an issue raised by Plaintiff at the hearing. ECF No. 42. Plaintiff responded with her own letter on December 15, 2013. ECF No. 43. On December 20, 2013, in its second letter submitted to this Court, AT&T responded to the arguments and case law raised in Plaintiff's letter. ECF No. 44.

---

[1] The scheduled hearing was for Defendant's motion to dismiss for lack of jurisdiction and Defendants' motion to compel arbitration and to stay. ECF No. 30. However, this Court chose not to proceed with arguments on Defendant's motion to dismiss under Rule 12(b)(2); rather, this Court issued a ruling based on the parties' submissions. *See* ECF No. 41 at 3–5.

## Discussion

**I.     Motion to Dismiss for Lack of Personal Jurisdiction**

**A.     Standard of Review**

When personal jurisdiction is challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of showing that jurisdiction exists. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003).  "[T]he plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence."  *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).  However, when the court addresses the issue of jurisdiction on the basis of pleadings, motion papers, and supporting legal memoranda without an evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction.[2]  *Id.; Carefirst of Md., Inc.*, 334 F.3d at 396.  In deciding such a motion, the court "must construe all relevant pleading allegations in the light most favorable to Plaintiffs, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  *New Wellington Fin. Corp.*, 416 F.3d at 294; *see also Precept Med. Prods., Inc. v. Klus*, 282 F. Supp. 2d 381, 385 (W.D.N.C. 2003) ("[F]or the purposes of a Rule 12(b)(2) motion, the Court will accept the Plaintiff's version of disputed facts.").  A plaintiff's claim for personal jurisdiction may be established by pointing to affidavits or other relevant evidence, *see New Wellington Fin. Corp.*, 416 F.3d at 294, and must also be based "on specific facts set forth in the record."  *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992).

---

[2] As stated above, this Court dispensed with arguments on Defendant AT&T Inc.'s motion to dismiss, and based its ruling on the parties' submissions.  *See* ECF No. 41 at 3–5.

###     B.     Analysis

To validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and second, the exercise of personal jurisdiction must not "overstep the bounds" of Fourteenth Amendment due process. *Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 317 (4th Cir. 2000). South Carolina's long-arm statute[3] has been construed "to extend personal jurisdiction to the constitutional limits imposed by federal due process." *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002); *see also Cockrell v. Hillerich & Bradsby Co.*, 611 S.E.2d 505, 508 (S.C. 2005). Thus, to comport with both South Carolina law and the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that: (1) the non-resident defendant has "minimum contacts" in this forum and (2) requiring the defendant to defend its interest in this state "does not offend traditional notions of fair play and substantial justice."

---

[3] A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:

    (1) transacting any business in this State;
    (2) contracting to supply services or things in the State;
    (3) commission of a tortious act in whole or in part in this State;
    (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;
    (5) having an interest in, using, or possessing real property in this State;
    (6) contracting to insure any person, property, or risk located within this State at the time of contracting;
    (7) entry into a contract to be performed in whole or in part by either party in this State; or
    (8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

S.C. Code Ann. § 36-2-803(A).

*Foster*, 278 F.3d at 414 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))*.* A defendant has sufficient minimum contacts with a state when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The analytical framework for determining whether minimum contacts exist differs according to whether a defendant is subject to general or specific personal jurisdiction. A court has general jurisdiction over an out-of-state defendant "when [the defendant's] affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, ___, 131 S.Ct. 2846, 2851 (2011) (quoting *Int'l Shoe Co.*, 326 U.S. at 317). On the other hand, a court has specific jurisdiction over parties when the claims "arise out of or relate to" the defendant's contacts with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

It is undisputed that Defendant AT&T Inc. is incorporated in Delaware and its principal place of business is in Texas. Further, Plaintiff does not argue that Defendant AT&T Inc. has any physical presence within the state of South Carolina. Unlike Defendants BellSouth and AT&T Corp., Defendant AT&T Inc. is not registered to conduct business in South Carolina, and has no authorized individual or corporation that accepts service of process or otherwise acts as an agent in South Carolina. In this case, it is clear to this Court that Defendant AT&T Inc. does not have 'systematic and continuous' contacts with South Carolina sufficient to support general

jurisdiction. As such, this Court must determine whether Defendant AT&T Inc.'s contacts related to this case are sufficient to subject Defendant AT&T Inc. to specific jurisdiction in South Carolina.

Plaintiff asserts that personal jurisdiction exists over Defendant AT&T Inc. based on theories of agency. ECF No. 22. That is, Plaintiff argues that BellSouth, AT&T Corp., or AT&T Intellectual Properties, Inc., are the agents of Defendant AT&T Inc. ECF No. 22 at 11. From this premise, Plaintiff argues that Defendant AT&T Inc. was transacting business in, contracting to supply services or things, and committed a tortious act in South Carolina by virtue of BellSouth's, AT&T Corp.'s, or AT&T Intellectual Properties, Inc.'s activities. *Id.* at 11–12; *see* S.C. Code Ann. § 36-2-803(A). Plaintiff further argues that Defendant AT&T Inc. is subject to jurisdiction in South Carolina because as "the successor in interest via merger" to BellSouth ("the named party to the contract that Plaintiff signed in this case"), Defendant AT&T Inc. "ratif[ied] a continuing tort in South Carolina." *Id.* at 15. Specifically, Plaintiff suggests Defendant AT&T Inc. "is the ultimate party responsible for sending a hidden notice of renewal and later charging ETFs" because "AT&T Inc., through its officers and directors, had to know of, or approve the collection of ETFs and chose not to disassociate itself, or stop its subsidiaries from charging ETFs to customers in South Carolina, the Southeast region, or to the public at large"—as indicated by the 888 consumer complaints in Georgia and 419 complaints in South Carolina. *Id.*; *see also* ECF Nos. 24-10, 24-11, & 24-12. Defendant AT&T Inc. denies that BellSouth, AT&T Corp., or any other corporation in the AT&T family was its agent in South Carolina, contending that these are separate and legitimate corporations. ECF No. 31 at 7.

Generally, when considering whether jurisdiction may be asserted over the non-resident parent corporation solely on the basis of the subsidiary's contacts with the forum, courts presume independence between the parent and the subsidiary. *Toney v. Family Dollar Stores, Inc.*, 273 F. Supp. 2d 757, 761 (S.D.W. Va. 2003). However, this presumption may be overcome by showing other facts beyond the subsidiary's mere presence in the corporate family. *Id.* For example, where the parent corporation exerts significant control over the activities of the subsidiary. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993); *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976). In addition, an "agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) (internal citations omitted).

In this case, the documents exchanged between the parties promote AT&T as one solidified business. Furthermore, AT&T Inc. and its subsidiaries file consolidated tax returns and issue consolidated financial statements. In its annual reports and in its Securities and Exchange Commission 10-Q reports, AT&T Inc. refers to itself as "AT&T" or "the Company," defined to mean AT&T Inc. together with its "majority-owned subsidiaries and affiliates." ECF No. 22-2 at 8. These annual reports show AT&T Inc. considered itself and its subsidiaries to be an integrated, national telecommunication services conglomerate. Moreover, this Court agrees with Plaintiff that AT&T Inc. was aware of the ETFs and consumer complaints and did not stop this practice. Accordingly, this Court holds that AT&T Inc., through its relation with BellSouth or AT&T Corp., has subjected itself to this Court's jurisdiction pursuant to

South Carolina law as a result of the South Carolina-based activities of AT&T Corp. or BellSouth.

## II.     Motion to Compel Arbitration

### A.     Standard of Review

The Federal Arbitration Act ("FAA") establishes a "strong federal public policy in favor of enforcing arbitration agreements," and is designed to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217–19 (1985). The FAA was enacted by Congress in 1925 "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts." *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 639 (4th Cir. 2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). "Underlying this policy is Congress' view that arbitration constitutes a more efficient dispute resolution process than litigation." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (internal citations omitted).

The FAA provides that arbitration clauses in contracts involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, a district court must compel arbitration and stay court proceedings if the parties have agreed to arbitrate their dispute. *Id.* §§ 2, 3. But, if the validity of the arbitration agreement is in issue, a district court must first decide if the arbitration clause is enforceable against the parties. *Id.* § 4. "[A]ny doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration." *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 349 (4th Cir. 2001) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). "A court should not deny a request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 349–350 (internal quotations omitted). However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). A party can compel arbitration by establishing: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision purporting to cover the dispute and that is enforceable under general principles of contract law; (3) the relationship of the transaction, as evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of a party to arbitrate the dispute. *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005).

"[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Adkins*, 303 F.3d at 501 (internal quotations omitted). "Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "Generally applicable contract defenses, such as fraud, duress, or unconscionablity, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 682 (1996). "[T]he party resisting arbitration bears the

burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 81 (2000).

### B.     Analysis

In this case, Plaintiff disputes the existence of only one of the four prerequisites for compelling arbitration.  It is clear that there is a dispute between the parties, that the contract signed by Plaintiff involves interstate commerce since AT&T provides telephone services to customers world-wide, and that Plaintiff has refused to submit her claims to arbitration.  At issue in this case, then, is whether an enforceable arbitration provision exists under general principles of contract law.

AT&T argues that Plaintiff must settle her disputes with AT&T through arbitration, pursuant to the terms and conditions of her contract.  ECF No. 14.  In response, Plaintiff asserts that she, and others similarly situated, did not assent to arbitrate or waive the right to participate in a class action.  ECF No. 21.  In addition, Plaintiff argues that if this Court finds she did assent to the arbitration clause, it is nevertheless unenforceable and invalid under South Carolina law because it is unconscionable.  *Id.*  In its reply, AT&T argues that Plaintiff is bound to an arbitration agreement, that the FAA governs the arbitration agreement, and that the arbitration agreement is not unconscionable.  ECF No. 32.  In its sur-reply, Plaintiff asserts that the claims at issue are not within the scope of arbitrable issues and that the arbitration clauses in the various agreements surrounding this case are unconscionable and unenforceable in their entirety.  ECF No. 36.

Despite Plaintiff's many arguments against compelling arbitration, she has not met her burden of proving that her claims are unsuitable for arbitration. *See Green Tree*, 531 U.S. at 81. This Court will discuss each of Plaintiff's arguments below.

### 1.    Agreement to Arbitrate

Plaintiff argues that she did not consent to the document containing an early termination fee and automatic renewal provision, the "BellSouth Simple Savings Program 2006-2007 Agreement" ("SSPA"), and that she did not waive her right to participate in a class action. ECF No. 21 at 4–5. Plaintiff suggests that after she physically signed by hand the WRPA, a representative from Evergreen Telecom Services, LLC signed her up for business telephone services and presented the SSPA, if at all, to her by a fax, "several days later without any affirmative action on her part to assent to its terms." *Id.* at 5 n.12.

Defendants argue that Plaintiff's assertions surrounding the SSPA are misplaced because "AT&T is not contending that [Plaintiff] used the Internet to manifest assent to an 'online agreement'[;] [r]ather, AT&T is relying on the contract that [she] physically signed by hand and attached to the complaint." ECF No. 32 at 4. Defendants argue that there is no dispute surrounding the WRPA because Plaintiff admittedly signed the WRPA and entered into that contract, which incorporates additional terms by reference. ECF No. 32 at 2, 4; *see* ECF Nos. 24 at 5, 24-1 at 2–4. Defendants have demonstrated that Plaintiff agreed to arbitrate by showing that Plaintiff agreed to Defendants' terms of service. *See* ECF No. 32 at 2–3. Defendants have established that those incorporated terms were maintained on the website specified above her signature, and that the terms incorporated by reference included

the BSA, which contained an agreement to arbitrate "all disputes arising out of or related to this agreement," and a requirement that the arbitration take place individually, rather than on a class-wide basis.  ECF No. 14-2; *see also* ECF No. 24-5 ¶8.[4]  Plaintiff's argument that she could not have seen the incorporated terms online because she "does not use a computer to access the internet," ECF No. 21 at 11, does not rise to the necessary level for escaping the obligation of the incorporated contract provision.  *See First Baptist Church of Timmonsville v. George A. Creed & Son, Inc.*, 281 S.E.2d 121, 123 (S.C. 1981) ("[I]n the absence of a showing of fraud, mistake, unfair dealing or the like, a party to a contract incorporating an arbitration provision cannot escape the obligation of such a provision by simply declaring: 'But I did not read the whole agreement'"); *Brown v. Green Tree Servs., LLC*, 585 F.Supp. 2d 770, 777 (D.S.C. 2008) (affirming that "every contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it").  If a party could get out of a contract by arguing that she did not read it, contracts would be meaningless.

This Court agrees with Defendants that Plaintiff entered into a business contract for telephone services, the WRPA, which incorporates by reference an arbitration agreement.  As the Fourth Circuit has emphasized, a clause requiring arbitration of disputes "arising out of or related to this Agreement" is "capable of an

---

[4] In her amended complaint, Plaintiff attaches an "AT&T Business Service Agreement."  ECF No. 24-6.  Defendants argue that "[e]ven if the contract [Plaintiff] signed and [she] attached to [her] complaint incorporated those terms instead of the [terms in the] BSA—and it does not— the result would be the same: Both sets of terms include an arbitration agreement that waives class actions."  ECF No. 32 at 3 n.2.  However, at the hearing, Plaintiff's attorney referenced specific provisions of the BSA. ECF No. 41 at 10.  Therefore, this Court finds that the appropriate document incorporated by reference into the WRPA is the BSA.

expansive reach" and embraces a "broad scope of arbitrable issues." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996); *see also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988).    Plaintiff's claims, arising from a dispute over whether she was properly assessed an early termination fee, therefore, arise out of her contract with AT&T for telephone services (the WRPA) and fall within the scope of the arbitration clause in the BSA.  Accordingly, Plaintiff agreed to arbitrate her claims and she should be held to the terms of the agreement—provided they are valid and enforceable.

### 2.    Enforceability under South Carolina Law

Plaintiff next argues that the arbitration provision is unconscionable under South Carolina law because it precludes class action lawsuits as part of a contract of adhesion, it limits liability, and it includes prohibitive arbitration costs.  ECF Nos. 21 at 8 & 35 at 5.

 "In analyzing claims of unconscionability in the context of arbitration agreements, the Fourth Circuit has instructed courts to focus generally on whether the arbitration clause is geared towards achieving an unbiased decision by a neutral decision maker." *Simpson v. MSA of Myrtle Beach, Inc.*, 644 S.E.2d 663, 669 (S.C. 2007) (citing *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)). Under limited circumstances, "equity may require invalidation of an arbitration agreement that is unconscionable."  *Murray v. United Food & Commercial Workers*, 289 F.3d 297, 302 (4th Cir. 2002).  An arbitration agreement, under South Carolina law, is unconscionable and unenforceable when there is an "absence of meaningful choice" combined with "oppressive, one-sided terms." *Simpson*, 644 S.E.2d at 669.

An inquiry into unconscionability requires that a court first address "whether a contract was 'tainted by an absence of meaningful choice.'" *Id.* (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 295 (4th Cir. 1989)). In making this determination,

> courts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause.

*Simpson*, 644 S.E.2d at 669. Second, in inquiring into unconscionability, a court must examine the terms of the agreement, and assess whether the terms are "so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 472 S.E.2d 242, 245 (S.C. 1996).

In addressing the issue of absence of meaningful choice, Plaintiff contends that the contract she entered into, which incorporates the arbitration provision by reference, and the other "agreements in question," are adhesion contracts. ECF No. 21 at 10. Adhesion contracts are standard form contracts offered on a take-it-or-leave-it basis with terms that are not negotiable. *Simpson*, 644 S.E.2d at 669 (citing *Munoz v. Green Tree Fin. Corp.*, 542 S.E.2d 360, 365 (2001)). Plaintiff concedes that adhesion contracts are not *per se* unconscionable. ECF No. 21 at 10; *see Lackey v. Green Tree Fin. Corp.*, 498 S.E.2d 898, 902 (S.C. App. 1998). Plaintiff further argues that, as "the owner of a small business with no legal training," she does not possess "sophisticated business judgment" and could not "understand the implications" of the arbitration agreement. ECF No. 21 at 11. Plaintiff also asserts that "there was a strong element of surprise in BellSouth's attempt to bind Plaintiffs to multiple

agreements with conflicting and inconsistent terms." *Id.* Moreover, Plaintiff argues that she lacked any meaningful choice in waiving her right to participate in a class action. *Id.* at 8. Thus, Plaintiff implies that she was forced to enter into an arbitration agreement with Defendants.

The "mere fact that one party to the contract is larger than the other" cannot be the basis of a finding of unconscionability of an arbitration clause in a contract. *Stedor Enters., Ltd. v. Armtex, Inc.*, 947 F.2d 727, 733 (4th Cir. 1991); *see also AT&T Mobility, LLC v. Concepcion*, ___ U.S. ___, ___, 131 S.Ct. 1740, 1750 (2011) (explaining that "the times in which consumer contracts were anything other than adhesive are long past"). Likewise, "[i]nequality of bargaining power alone will not invalidate an arbitration agreement." *Munoz*, 542 S.E.2d at 365 n.5 (internal citations omitted). Moreover, as previously stated, a party to a contract has a duty to read the contract and learn its contents before signing it. *Burwell v. S.C. Nat'l. Bank*, 340 S.E.2d 786, 789 (S.C. 1986); *see also Munoz*, 542 S.E.2d at 365 (recognizing that "a person who can read is bound to read an agreement before signing it"); *Cont'l Jewelry Co. v. Kerhulas*, 134 S.E. 505, 507 (S.C. 1926) (emphasizing that a defendant who is "not capable of reading understandingly for himself" has a "duty . . . to read the contract he was requested to sign, or to have it read and explained to him by some other person"). Further, in *Concepcion*, the United States Supreme Court, addressing the enforceability of a class action waiver, held that "[r]equiring the availability of classwide arbitration interferes with the fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." 131 S.Ct. at 1748. The Fourth Circuit has held that the Supreme Court's holding in *Concepcion* "plainly

prohibited application of the general contract defense of unconscionability to invalidate an otherwise valid arbitration agreement" on the basis that it contains a class action waiver. *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 180 (4th Cir. 2013). In this case, Plaintiff is not excused from the specific contract she signed and, as Defendants made clear, "if she could not understand the obligations she was undertaking when she signed the contract on behalf of her business, it was her duty to seek out assistance in having the contract explained." ECF No. 32 at 11. In addition, this Court is not persuaded that Plaintiff was surprised by the terms of the arbitration agreement and class action waiver because by signing the contract she manifested her assent to be bound by its terms. Accordingly, Plaintiff fails to present evidence of circumstances showing an absence of meaningful choice sufficient to defeat Defendants' motion.

Plaintiff also argues that the arbitration clause is unconscionable because it limits potential remedies and claims. ECF No. 21 at 12, 14. Plaintiff argues that the limitation of remedies is one-sided because the arbitration agreement limits "BellSouth's total liability" to "the amount of charges paid by you for any service under this agreement." ECF No. 24-5, ¶ 6.c. The arbitration agreement also requires that customers waive their rights in advance, "except where prohibited by law," to claims for "indirect, incidental, special or consequential damages." *Id.* at ¶ 6.b. Plaintiff relies on *Simpson* to support her assertion that the arbitration provision contains oppressive and one-sided terms. ECF No. 21 at 12. In *Simpson*, the South Carolina Supreme Court, finding that the arbitration clause in an automobile purchase agreement prevented the plaintiff from receiving the mandatory statutory remedies to

which he may have been entitled under the South Carolina Unfair Trade Practices Act ("SCUTPA"), held "that the provision in the arbitration clause dictating that the dealer's judicial remedies supersede the consumer's arbitral remedies" was "one-sided and oppressive" and did not "promote a neutral and unbiased arbitral forum." 644 S.E.2d at 672.  Plaintiff also relies on an out of circuit, Supreme Court of Vermont case, *Glassford v. BrickKicker*, 35 A.3d 1044 (Vt. 2011), for the proposition that contractual provisions limiting liability to service costs while still requiring arbitration, which inevitably costs more than the amount of the liability limit, creates an illusory remedy, and is therefore unconscionable.  ECF No. 21 at 15–16.

In this case, Plaintiff seeks relief under RICO requesting treble damages, damages under the FCA, damages pursuant to various state unfair and deceptive trade practice laws, and unjust enrichment.[5]  The United States Supreme Court has held that in cases where it is uncertain how the arbitrator will construe remedial limitations, "the proper course is to compel arbitration."  *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406–07 (2003) (holding that "the issue of whether statutory treble damages under RICO statute were barred was not yet ripe because there was some question as to whether treble damages were punitive or compensatory, and it was unclear how an arbitrator would rule on the issue"); *see also Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 606 S.E.2d 752, 759 (S.C. 2004) (holding that complaints about the unavailability of treble damages under the SCUTPA must first be presented to the arbitrator).  Accordingly, this Court will not speculate that the

---

[5] The requested relief is only a sample of the relief Plaintiff seeks in her amended complaint, which contains twelve causes of action.  *See* ECF No. 24.

arbitration agreement deprives Plaintiff of all remedies or creates illusory remedies; instead, Plaintiff must first pursue her remedies through arbitration.

Plaintiff further alleges that the arbitration agreement lacks mutuality and is therefore unconscionable "when combined with a consumer's lack of meaningful choice in agreeing to arbitrate." ECF No. 21 at 14.  Defendants assert that "the arbitration agreement is . . . fully mutual," because it "imposes reciprocal obligations on AT&T and [Plaintiff] to arbitrate" their disputes, with a single exception that debts can be handled in court.  Moreover, the Supreme Court of South Carolina has held that "a lack of mutuality of remedy does not invalidate a contract." *Munoz*, 542 S.E.2d at 365; *see also Gadberry v. Rental Servs. Corp.*, 2011 WL 766991, at *3 (D.S.C. Feb. 24, 2011) ("[M]utuality is not a requirement for a valid arbitration agreement."). Plaintiff's argument, therefore, fails.

Lastly, Plaintiff argues that the arbitration agreement is unconscionable due to the prohibitive costs of arbitration.  ECF No. 35 at 5.  Plaintiff argues that to remedy her claims, AT&T will force Plaintiff to incur significant expenses related to arbitration, and that enforcing such an agreement violates the Supreme Court's holding in *Green Tree*, 531 U.S. 79, and the principles established by the Fourth Circuit in *Muriithi*, 712 F.3d 173.  In *Green Tree*, the Supreme Court noted that "[i]t may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum."  531 U.S. at 90; *see also Am. Exp. Co. v. Italian Colors Rest.*, ___ U.S. ___, ___, 133 S. Ct. 2304, 2310–11 (2013) (emphasizing that an arbitration agreement may be invalidated when "filing and administration fees attached to arbitration [ ] are so high as to make access to

the forum impracticable."). However, the *Green Tree* Court held that "[t]he 'risk' that [a litigant] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91. The party claiming prohibitive arbitration costs "bears the 'substantial' burden of showing a likelihood of incurring arbitration costs" and must "present sufficient evidence of: (1) the cost of arbitration; (2) his ability to pay; and (3) the difference in cost between arbitration of his dispute and litigation." *Muriithi*, 712 F.3d at 181 (internal citations omitted). Here, Plaintiff argues that the arbitration fee for simply filing the case is likely to be $975. ECF No. 43 at 1–2; *see also* ECF No. 14-4 at 41. Plaintiff, in her PowerPoint presentation, which is not filed on the record, posits to this Court that hiring an arbitrator for one day, based on the average daily rate of AAA arbitrator compensation in 2008 of $1,225.00, would be roughly twice the early termination fee she is contesting ($600). *See also* ECF No. 41 at 16 (arguing "the average arbitration cost is $600 a day"). Additionally, Plaintiff estimates that she would have to pay $10,000, plus $30,000 in expert fees, in order to prove her claim. ECF No. 41 at 39–40. However, the United States Supreme Court has made clear that "the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy" and thus, cannot be considered in assessing the enforceability of an arbitration agreement. *Am. Exp. Co.*, 133 S. Ct. at 2311 (emphasis in original). Defendants argue that Plaintiff "has failed to meet her burden of showing that arbitration costs preclude her from pursuing her claim." ECF No. 44 at 3. In support, Defendants assert that Plaintiff has not submitted any evidence on her ability to pay the fees and that she has provided only mere speculation as to what her arbitral costs

would be.  This Court agrees that Plaintiff's argument is too speculative to bar enforcement of the agreement.  Accordingly, there is no basis to find that Plaintiff will be saddled with prohibitive arbitration costs, or that *Green Tree*, 531 U.S. 79, would bar enforcement of the arbitration agreement.

Moreover, this Court notes that Defendants' have offered to pay all of Plaintiff's arbitration costs and fees if this case is referred to arbitration.  ECF No. 14-6 at 4 n.2. "A party's agreement to pay all arbitration costs, when made in a timely manner such as before a district court has ruled on the enforceability of the arbitration clause, 'moots' the issue and forecloses the possibility that the opposing party could endure any prohibitive costs in the arbitration process." *Muriithi*, 712 F.3d at 183 n.10 (internal citations omitted); *see also Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302 (4th Cir. 2001) (reversing the district court's ruling "that the arbitration agreement was unconscionable" because the district court was "presented with little evidence from which [it] could have concluded that arbitration was prohibitively expensive" and the party seeking enforcement of the arbitration provision "represented to [the] court its willingness to pay arbitration fees arising from [the] dispute."); *Dillow v. Household Intern. Inc.*, 2004 WL 5336055, at *3 (W.D. Va. Apr. 26, 2004) (denying a prohibitive cost challenge where one party "offered to pay all of the [other party's] individual arbitration fees.")  Therefore, in light of Fourth Circuit precedent, Defendants' offer to pay such costs forecloses the issue of prohibitive costs as to Plaintiff.

Accordingly, this Court finds that Plaintiff has not met her burden to establish unconscionability.  She had the ability to access the terms of service incorporated by

reference into the WRPA and was provided copies of such terms. She affirmatively indicated that she acknowledged, agreed to, and accepted the terms of the WRPA, which included the terms of service found at a specified website. Further, Plaintiff has not shown that the arbitration costs were prohibitively expensive, or that the arbitration provision was unfairly one-sided.

## Conclusion

After construing all relevant pleading allegations in the light most favorable to Plaintiff, assuming credibility, and drawing the most favorable inferences for the existence of jurisdiction, this Court finds that Plaintiff has made a *prima facie* showing of a jurisdictional basis as to Defendant AT&T Inc. based on minimum contacts. Additionally, Plaintiff's allegations are sufficient to make a *prima facie* showing that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. Moreover, for all of the foregoing reasons, this Court is satisfied that the arbitration provision in the BSA, which is incorporated by reference into Plaintiff's signed WRPA, is legally enforceable and that Plaintiff's claims are within the broad scope of the arbitration provision.

**IT IS THEREFORE ORDERED** that Defendant AT&T Inc.'s motion to dismiss for lack of jurisdiction is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendants' motion to compel arbitration is hereby GRANTED. Plaintiff shall be required to individually pursue her claims against Defendants, if at all, by way of arbitration. All further proceedings in this case are STAYED pending the outcome of the arbitration, at which time the parties are directed to submit an agreed final order of dismissal.

**IT IS SO ORDERED.**

G. Ross Anderson, Jr.
Senior United States District Judge

January 15, 2014
Anderson, South Carolina